<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE ESTATE OF AMIR BOTROS, by its Administratrix ad Prosequendum, SAHAR HANA<br><br>*Plaintiff*,<br>v.<br><br>GREAT AMERICAN INSURANCE GROUP, AND JOHN DOES 1-10 (a fictitious name),<br><br>*Defendants.* | Civil No. 2:18-cv-09882 (KSH) (CLW)<br><br>**<u>Opinion</u>** |

**Katharine S. Hayden, U.S.D.J.**

Before the Court are cross-motions for summary judgment brought by the plaintiff, the estate of Amir Botros by its administratrix ad prosequendum, Sahar Hana (the "Estate"), and the defendant, Great American Insurance Company ("Great American").[1] The issue is whether coverage under an occupational accident insurance policy issued by Great American was triggered under the circumstances of Botros's death.

Procedurally, on May 4, 2018, the Estate filed a complaint in state court based on its assertion that Botros "died, accidentally while in the performance of his

---

[1] Great American notes that it was improperly pleaded as "Great American Insurance Group."

1

occupation," and is therefore subject to a $250,000 accidental death benefit. (D.E. 1, Ex. A, Compl. ¶ 8.)[2] Great American timely removed this action based on diversity, pursuant to 28 U.S.C. § 1332, and answered. (D.E. 1, 2.)

Now Great American has filed a motion for summary judgment arguing that Botros did not die from an "injury" sustained by an "accident," as those terms are defined in the policy at issue. (D.E. 26-1, Def.'s Moving Br. 5.) Rather, Great American relies on record evidence that it claims establishes Botros suffered from coronary artery disease and other progressive health conditions that caused or contributed to his death. The Estate has cross-moved for summary judgment arguing that the policy covered any pre-existing conditions, relying on what it characterizes as two incongruent clauses relating to pre-existing conditions coverage. (D.E. 27-1, Pl.'s Moving Br. 11-12.) The motions are fully briefed (D.E. 26, 27, 28, 29) and the Court decides them without oral argument. *See* L. Civ. R. 78.1.

I.      **Background**

Unless otherwise noted, the following relevant facts are undisputed. Rafik George is the owner and operator of 7 Blue LLC, a company that assumes delivery routes from XPO Logistics, Inc. d/b/a TSA - XPO Servco a/k/a XPO Last Mile ("XPO") and arranges for them to be fulfilled. (D.E. 27-10, Exhibit I ("George

---

[2] The complaint also named ten unidentified John Does. As discovery is closed, these fictitious defendants will be dismissed. *Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250-51 (3d Cir. 2009); Fed. R. Civ. P. 21.

2

Dep.") at 12:2-11, 14:19-15:2, 25:1-14, 30:4-22.)  In the regular course of business, 7 Blue is paid a set price for each delivery route and, in turn, pays a set price to each entity that completes the delivery.  (*Id.* at 25:15-21, 30:4-22.)  One of the companies that 7 Blue utilized in its business was Mariam Trading, LLC, a delivery company owned and operated by Botros.  (*Id.* at 12:23-13:22.)  When 7 Blue assigned work to Mariam Trading, Botros fulfilled delivery routes between the hours of 10:00 p.m. and 4:00 a.m.  (Def.'s Moving Br. 1 ¶ 3.)[3]  On a typical workday, Botros arrived at an Amazon shipping warehouse in Avenel, New Jersey, transferred at least 10 pre-packaged pallets into a 26-foot box truck owned by George, and transported the load to a United States Post Office branch where he would obtain a signature upon completion of the delivery.  (George Dep. at 20:9-22:6.)  Depending upon demand, Botros sometimes returned to the warehouse to complete a second haul.  (*Id.* at 22:7-14.)

---

[3] In violation of L. Civ. R. 56.1(a) and this Court's judicial preferences, *see* LITE, N.J. FEDERAL PRACTICE RULES, *Survey of Judicial Officers*, Publisher's App'x 2, at 687 (GANN 2020), Great American failed to file a separate statement of material facts with its motion, and instead simply incorporated its statement in its moving brief.  Likewise, plaintiff failed to file a separate document with the supplemental statement of material facts in support of its cross-motion and opposition to Great American's motion, and also incorporated its statement into its brief.  In the interest of judicial efficiency, and in recognition of the parties' partial compliance with these requirements elsewhere (*see* D.E. 27-16; D.E. 28), the Court will nevertheless rule on the motions as presented.

During the evening of November 28, 2016, George observed Botros walking towards the truck inside of the warehouse, not carrying any packages.[4] (Def.'s Moving Br. 1 ¶ 4.) Botros's face turned red, and he held his chest and gasped for air as he sat down on an empty pallet. (George Dep. at 37:19-24, 39:2-7.) An ambulance transported him to Robert Wood Johnson University Hospital in Rahway around 11:33 p.m. (Pl.'s Moving Br. 1 ¶ 3.) Approximately one hour later, he died from cardiac arrest due to acute myocardial infarction. (*Id.* at 5-6 ¶ 5.)

Botros was a certificate holder of Truckers Occupational Accident Insurance Policy OA4767627-00-000014 (the "Policy"), which was in full force and effect on the date of his death. (Def.'s Moving Br. 2 ¶¶ 9-10.) Great American issued the Policy to policyholder National City and participating motor carrier XPO, and agreed to insure Botros against covered losses subject to the Policy's provisions, limitations, and exclusions. (D.E. 27-9, Ex. H, Policy at BOTROS 000136-37.)

## II.    Standard of Review

### A. Summary Judgment Standard

Summary judgment is proper where the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of

---

[4] The Estate states it is undisputed that Botros loaded his truck "halfway" at the time George observed him walking. (Pl.'s Moving Br. 8 ¶ 40.) Great American, however, denies that statement. (D.E. 28, Def.'s Resp. to Pl.'s 56.1 Stmt. ¶ 40.) Neither party argues, and the Court does not conclude, that their different versions have relevance to the Court's decision.

law. Fed. R. Civ. P. 56(a). In ruling on the motion, the Court views the evidence in the light most favorable to the nonmoving party and draws all inferences in favor of that party. *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-movant. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). At the summary judgment stage, the Court is not permitted to make credibility determinations or weigh the evidence. *Id.* at 428-29.

The same standard applies when cross-motions for summary judgment are filed. *Id.* "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)). Cross-motions for summary judgment are a particularly appropriate vehicle for deciding insurance coverage disputes such as this one, in which the parties do not contest the basic facts underlying the dispute. *See Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 510 (D.N.J. 2008) (Simandle, J.) ("Under New Jersey law, '[t]he interpretation of an insurance contract on undisputed facts is a question for the court to decide as a matter

of law and can be the basis for summary judgment.'" (citation omitted)), *aff'd*, 352 Fed. App'x 642 (3d Cir. 2009).

### B. Interpretation of Insurance Policies

"An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010). Policy language is interpreted "according to its plain and ordinary meaning." *Id.* (citation and internal quotation marks omitted). Terms that are not clear, but ambiguous, are construed in favor of the insured and against the insurer. *Id.* "If the language is clear, that is the end of the inquiry." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008). "[I]n the absence of an ambiguity, a court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased." *Id.* (citation omitted); *see also Flomerfelt*, 202 N.J. at 441. "If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists," and in that event, "a court may look to extrinsic evidence as an aid to interpretation." *Chubb*, 195 N.J. at 238.

Generally, policy exclusions are narrowly construed, and it is the insurer's burden to "bring the case within the exclusion." *Flomerfelt*, 202 N.J. at 442 (citation and internal quotation marks omitted). "[I]f there is more than one possible interpretation of the language, courts apply the meaning that supports coverage rather than the one that limits it." *Id.* But "far-fetched interpretation[s]" do not create

6

ambiguity, and "courts must be careful not to disregard the 'clear import and intent' of a policy's exclusion." *Id.* "Rather, courts must evaluate whether, utilizing a 'fair interpretation' of the language, it is ambiguous." *Id.*

## III.  Discussion

There is no dispute between the parties that Botros died of a heart attack. In the Estate's response to Great American's statement of undisputed facts, it acknowledges his cause of death as "'cardiac arrest' due to 'acute myocardial infarction.'" (D.E. 27-17, Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 8.) The death certificate issued to Botros confirms the same. (D.E. 27-6, Ex. E.) In its brief, Great American claims "there is overwhelming evidence that heart disease not only contributed, but was the sole cause of the heart attack and death." (Def.'s Moving Br. 11.) The Court is satisfied that there is no material dispute as to the cause of death here.

Great American relies on significant New Jersey jurisprudence in making its argument that policy coverage was not triggered under the circumstances of Botros's death. The earliest case is *Linden Motor Freight Co. v. Travelers Ins. Co.*, 40 N.J. 511, 515 (1963), where the New Jersey Supreme Court distinguished between accidental injuries and injuries caused by accidents. Two employees of a freight company went to work on a Saturday to prepare for the upcoming workweek. While at the warehouse, the men conducted a routine inventory inspection and noticed a pallet of Prestone out of place in violation of fire law ordinances. As one of the employees maneuvered a lift-truck to realign the pallet, several 63-pound Prestone cartons fell to

7

the floor. The other employee, whose clerical position did not encompass any physical effort, lifted and put at least seven of the cartons back. Afterwards, he started to cough, turn white, and gasp for air. While at a family gathering later that evening, he collapsed due to a myocardial infarction and died 16 days later.

The decedent's insurance policy -- of which his employer was designated as beneficiary -- provided for a double payment of the $10,000 face amount "upon the sustainment of 'bodily injuries effected directly and independently of all other causes through external, violent and accidental means.'" *Id.* at 513. The insurer did not pay the double indemnity and a lawsuit followed. The court affirmed the Appellate Division's decision in favor of the insurer, holding that the employee's injury was not "accidental" because the fact the cartons fell did not constitute the means effecting the injury. *Id.* at 538. Instead, the court held that the employee's heart attack was caused by his voluntary act of picking up the cartons. In its ruling, the court expressly adopted the approach announced in *Mutual Accident Ass'n v. Barry*, 131 U.S. 100 (1889), which held that accidental injury policies require that the injury be caused by something unforeseen, and that if the injury is an unexpected result of voluntary conduct during which nothing unusual occurred, no recovery could be had. The ruling thus distinguished an accidental injury from an accidental result.

In the year following *Linden*, the New Jersey Supreme Court decided *Harris v. John Hancock Mutual Life Insurance*, 41 N.J. 565 (1964), another insurance coverage dispute prompted by an employee's heart attack at the workplace. There the plaintiff

8

suffered a non-fatal myocardial infarction while performing his regular occupational duties, transporting steel tanks. Plaintiff sued his insurance carrier for benefits under an insurance policy that provided disability coverage "arising out of bodily injury sustained 'as the direct result of an accident, independent of all other causes.'" *Id.* at 567. The court reversed and directed judgment for the insurer.

In so ruling the court found that nothing unusual occurred nor did anything involuntary or unforeseen happen with respect to the plaintiff's physical voluntary activity prior to his heart attack. Instead, "[t]he effort was simply too great for his heart." *Id.* Referencing its recent decision in *Linden*, the court noted that where a policy does not cover accidental results but requires something accidental in the cause of a resulting injury, "the language cannot be construed to insure merely against an accidental result." *Id.* at 568.

The court focused on the events preceding the plaintiff's heart attack and announced that whether the means of his resulting bodily injury are accidental "will be determined by the reasonable appreciation, understanding and expectation of the average policy purchaser in the light of and having in mind the limiting language of the insuring clause." *Id.* The court held that "where the resultant injury is to the heart, brought on by reason of exertion from activity, voluntarily pursued, in which nothing unexpected or unforeseen occurs beyond the injury itself, and there is nothing which a layman would understand to be an accident, the average policyholder could not reasonably reach a conclusion of coverage." *Id.*

9

The third case Great American relies on is *Gottfried v. Prudential Insurance Co. of America*, 82 N.J. 478 (1980), in which the New Jersey Supreme Court reversed the Appellate Division's ruling in favor of the defendants and adopted the reasoning of the dissenting judge. Unlike the workplace heart attacks in *Linden* and *Harris*, Gottfried's acute myocardial infarction occurred at a dinner party immediately following a pickup game of basketball, and he died later that evening. *See* 173 N.J. Super. 381, at 383-84 (App. Div. 1978) (Kole, Judge, dissenting).

Judge Kole distinguished the policy at issue, which contained accidental bodily injury coverage, from "accidental means" policies, finding the former can insure against a broader risk of injury. *Id.* at 386-87. He reasoned that "an insured purchasing a policy with the 'accidental bodily injury' language in it may be said, as a matter of law, reasonably to have expected that a 44-year-old man, in the patently healthy condition of this insured prior to the incident here involved, would be compensated under this type of policy for a totally unexpected death that resulted from his voluntary overexertion through strenuous exercise.'" *Id.* at 382. Judge Kole further posited that "insurers can easily avoid coverage for such injuries or deaths by adopting language requiring accidental causation or means," indicating that not all heart attacks will be deemed accidental. *Id.* at 392.

To determine where in this spectrum the Policy at issue fits, the Court examines the relevant language.

**OCCUPATIONAL ACCIDENT SCHEDULE OF BENEFITS**
SCHEDULE OF BENEFITS: OCCUPATIONAL
DESCRIPTION OF BENEFITS: OCCUPATIONAL
**ACCIDENTAL DEATH AND DISMEMBERMENT**
MAXIMUM BENEFIT AMOUNT     $250,000 PRINCIPAL SUM
SURVIVOR'S BENEFIT (LUMP SUM)     (($50,000 DEATH LUMP SUM) + $2,000/MTH UP TO 100 MTHS)
INCURRAL PERIOD     104 WEEKS

. . .

**OCCUPATIONAL ACCIDENT SUPPLEMENTAL SCHEDULE OF BENEFITS**
SCHEDULE OF BENEFITS: OCCUPATIONAL
DESCRIPTION OF BENEFITS: OCCUPATIONAL
**PRE-EXISTING CONDITIONS COVERAGE APPLIES TO:**
ACCIDENTAL DEATH AND DISMEMBERMENT
ACCIDENTA MEDICAL EXPENSE
TEMPORARY TOTAL DISABILITY
MAXIMUM BENEFIT AMOUNT: $15,000

. . .

**SECTION I**

**GENERAL DEFINITIONS**

**Accident** means a sudden, abrupt, discrete, and unexpected event resulting in physical injury, and that takes place without expectation and abruptly, rather than something which continues, progresses, or develops.

. . .

**Covered Loss(es)** means one or more of the losses or expenses described as such in Section IV of this Policy.

. . .

**Injury** means physical Injury to an Insured Person caused by an Occupational Accident while coverage is in force under this Policy, which results directly and independently of all other causes in a Covered Loss.

11

All Injuries sustained by an Insured Person in any one Accident shall be considered a single Injury.

**Insured** means a person who: (1) is a member of an eligible class as described in the Eligible Persons section of the Schedule of Benefits, and (2) has enrolled for coverage, and (3) has paid the required premium. However, an Insured does not include any person covered under this Policy solely as an Authorized Passenger.

**Insured Person** means an Insured or, if Authorized Passenger coverage is scheduled on the Schedule of Benefits, an Authorized Passenger.

. . .

**Occupational** means, with respect to an activity, accident, incident, circumstance or condition involving an Insured, that the activity, accident, incident, circumstance or condition is proximately caused by the Insured's performing services within the course and scope of contractual obligations for the Motor Carrier, while under Dispatch or while operating under the Insured's Federal Highway Administration authority. . . .

. . .

**Pre-Existing Conditions** means a health condition for which an Insured Person has sought or received medical advice or treatment at any time during the twelve months immediately preceding his or her effective date of coverage under this Policy.

. . .

**SECTION IV**

**BENEFITS**

For the purpose of computing the benefits to which an Insured Person is entitled under this policy, all Injuries sustained by an Insured Person in any one Accident shall be considered a single Injury.

. . .

**Accidental Death Benefit**

If Injury to the Insured Person, directly caused by an Occupational Accident, results in the death of that Insured Person within the Incurral Period shown in the Schedule, the Company will pay a Survivor's Benefit, subject to the terms and conditions described in the Survivor's Benefit section below, and subject to any applicable Deductible Amount for the Accidental Covered Loss shown in the Schedule.  The Incurral Period starts on the date of the accident that caused such Injury. . . .

. . .

**SECTION VI**

**EXCLUSIONS**

This Policy does not cover any Injury, Accident, expense, or loss caused in whole or in part by, or resulting in whole or in part from, any of the following:

. . .

3.  any Pre-Existing Condition, unless the Insured Person has been continuously covered under this Policy (or a substantially identical policy issued by the Company or another insurer, of which this policy is a renewal) for twelve consecutive months[.]

. . .

**PRE-EXISTING CONDITIONS COVERAGE RIDER**

This Rider is attached to and made part of the Policy as of the Policy Effective Date as shown on the Policy Schedule of Benefits.  It applies only with respect to accidents that occur on or after that date and prior to the Policy Anniversary/Expiration Date.  It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Pre-Existing Conditions Coverage.**  Exclusion 3 in Section VI of the Policy is hereby waived for a Covered Loss described in Section IV of the Policy.  However, in no event, will benefits be payable for any Covered Losses caused in whole or in part by, or resulting in whole or in part from,

>any Pre-Existing Conditions exceeding the Maximum Benefit Amount shown in the Schedule for this Rider. . . .

(Policy at BOTROS 000138-64.)

Great American contends that to trigger benefits, the Policy requires that an injury caused by an accident results in death, as those terms are defined. The general definitions contained in the Policy define "injury" as "a physical Injury to an Insured Person caused by an Occupational Accident . . . which results directly and independently of all other causes in a Covered Loss," and "accident" as "a sudden, abrupt, discrete, and unexpected event resulting in physical injury, and that takes place without expectation and abruptly, rather than something which continues, progresses, or develops." (Policy at BOTROS 000141-42.) Looking back to the Policy's accidental death benefit's insuring clause, liability attaches only "[i]f Injury to the Insured Person, directly caused by an Occupational Accident, results in the death of that Insured Person[.]" (*Id.* at BOTROS 000146.)

Even if the Court finds an "accident" under the circumstances presented here, Great American claims it is still entitled to summary judgment because Botros's heart attack was the sole cause of his death, and the Estate is therefore unable to show the existence of a qualifying "injury." Citing *Gottfried*, Great American contends a critical distinction exists between a pre-existing condition that is known and progressive, and one that is unknown and inactive that is aggravated by an accident. In sum, Great American's support for summary judgment in its favor is that for coverage to be

14

triggered under the accidental death benefit's insuring clause, the Estate must show an "injury" caused by an "accident" that directly and independently results in death. Similarly, in its opposition to the Estate's summary judgment motion, Great American contends that Botros died from a patent heart condition, and that the Estate cannot establish that his coronary artery disease was a latent condition aggravated by an accident.

For its part, the Estate argues that summary judgment in its favor is appropriate because the Policy is ambiguous and the "accident" requirement of the Policy does not apply. The second theory devolves from the first; as the Estate puts it, the inclusion of a pre-existing conditions provision, is itself an ambiguity -- "a peculiar ambiguity" -- because there is "no such thing as a preexisting accident." (Pl.'s Moving Br. 13.)

The Court is not persuaded by this semantical exercise, nor does it find that the Policy language is ambiguous. The core of the ambiguity claim is the preexisting conditions exclusion and the Rider waiving the exclusion. Review of the Policy language defeats that argument.

The Policy discusses pre-existing conditions in two places. In the General Definitions section, they are defined thus:

> **Pre-Existing Conditions** means a health condition for which an Insured Person has sought or received medical advice or treatment at any time during the twelve months immediately preceding his or her effective date of coverage under this Policy.

15

(Policy at BOTROS 00143.)  Then there is the Rider providing pre-existing conditions coverage, which -- critically -- is "subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified" by the Rider:

> **PRE-EXISTING CONDITIONS COVERAGE RIDER**
>
> . . .
>
> **Pre-Existing Conditions Coverage.**  Exclusion 3 in Section VI of the Policy is hereby waived for a Covered Loss described in Section IV of the Policy.  However, in no event, will benefits be payable for any Covered Losses caused in whole or in part by, or resulting in whole or in part from, any Pre-Existing Conditions exceeding the Maximum Benefit Amount shown in the Schedule for this Rider. . . .

(*Id.* at BOTROS 000164.)  Drilling into this language, Section VI of the Policy is entitled "Exclusions."  Exclusion 3 is "any Pre-Existing Condition."  (*Id.* at BOTROS 000156.)  The Rider waives that exclusion "for a Covered Loss described in Section IV."  (*Id.* at BOTROS 000164.)  Section IV is headed with the word "Benefits."  The description of the relevant covered loss in Section IV is the Accidental Death Benefit, the "triggering clause" that Great American regularly refers to:

> If Injury to the Insured Person, directly caused by an Occupational Accident, results in the death of that Insured Person within the Incurral Period shown in the Schedule, the Company will pay a Survivor's Benefit[.]

(*Id.* at 000146.)

The Estate agrees that the Rider limits pre-existing conditions coverage to $15,000.  But the Estate argues that the Rider is subject to two different meanings:

16

one that exempts the insured from the Policy's requirement that it be in effect for at least 12 months in order to qualify; the other that "eliminates the $250,000 maximum benefit available for death due to a preexisting condition." (Pl.'s Moving Br. 12.)

The Court is constrained to ask here, "<u>What</u> $250,000 maximum benefit available for death due to a pre-existing condition?" The Rider waives the exclusion of pre-existing conditions *for covered losses* described in the Policy, and the covered loss relevant here is an <u>injury</u> directly caused by an <u>occupational accident</u> that results in death. The Estate not only fails to uncover an ambiguity, but its argument would rewrite the Policy and create coverage out of an exclusion. This is expressly forbidden under New Jersey law. *See Cusamano v. New Jersey Ins. Underwriting Assoc.*, 2020 WL 1026748, at *3 (App. Div. Mar. 13, 2020); *see also Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 247-48 (1979) ("exclusion clauses [s]ubtract from coverage rather than grant it," and each exclusion is read independently of each other).

The Estate moves from ambiguity grounds to coverage arguments by claiming that the "accident" requirement as defined kicks any pre-existing conditions coverage out of the Policy; the argument goes that "the accident requirement cannot apply to death from a preexisting condition." (Pl.'s Moving Br. 14.) Because that cannot be -- the Rider language is in the Policy -- the Estate turns that dynamic around and argues that the Rider's pre-existing conditions coverage kicks out the "accident" *and* the

17

proximate cause requirements of the death benefit.[5] All that is left, the Estate argues, is to determine whether the death from a pre-existing condition is "occupational," and because Botros died from coronary artery disease while on the job, coverage at the full $250,000 maximum death benefit is available under the Policy.

Albeit the Estate's brief in support of summary judgment makes these arguments as examples of ambiguities requiring judgment in favor of coverage, *see* Pl.'s Moving Br. 18, the characterization fails. There is clear and unambiguous language establishing what is covered, what is excluded, what exclusion is waived by the Rider, and what the insured is required to show in claiming the maximum death benefit payable. Any ambiguity argument becomes even more unpersuasive in the Estate's brief opposing Great American's motion and further supporting its cross-motion. In what the Court will charitably call a misreading of Great American's moving brief, the Estate announces that "[t]he Defendant even admits that the preexisting conditions clause of its own policy is 'not a model of clarity.'" (D.E. 29, Pl.'s Opp. Br. 4.) Not so; Great American was characterizing the Estate's motion for summary judgment: "While not a model of clarity, Plaintiff's motion argues the 'Preexisting Conditions Coverage Rider' . . . eliminates the 'Accident' requirement from the death benefits insuring clause." (Def.'s Opp. Br. 2.)

---

[5] In its opposition brief, the Estate circles back and argues that indeed the heart attack was an "accident," because it was a sudden, abrupt, and unexpected event that resulted in death. Great American effectively demonstrates that the case law goes the opposite way, and the Court need not revisit the issue.

Finally, in its opposing brief the Estate takes its interpretation of the Rider as essentially the new trigger for coverage to the extreme. Focusing on the definition of "occupational" in the Policy, the Estate maintains that it contains four words that "drastically alter this policy from one that only covers accidents, like motor vehicle accidents or falling cargo accidents, to one that covers nearly any type of event that occurs while in dispatch, that results in death, as long as the insured meets the durational requirement for preexisting conditions coverage." (Pl.'s Opp. Br. 5.) The Court remains unpersuaded and, more to the point, unconvinced that further effort to parse these arguments is a proper use of its resources.

**IV.     Conclusion**

The Estate has essentially rewritten the clear language of the Policy to support its argument that the genuinely moving circumstances of Amir Botros's death triggered payment under the accidental occupational death benefit offered by the Policy. Great American prevails in its arguments that the Estate failed to show the presence of a qualifying "accident" or "injury" to trigger the death benefits insuring clause. As a result, summary judgment is granted to Great American, and denied to the Estate. An appropriate order will issue.

Date: November 3, 2020
/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

19